1        UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF INDIANA

3

4  HOLLY L. BROOKS,                  )

5         Plaintiff,                 )

6         -vs-                       ) No. 1:19-cv-765

7  AIR METHODS CORPORATION,          )

8         Defendant.                 )

9

10     The video evidence deposition of DAVID S.

11  GIBSON called for examination pursuant to Notice

12  and the Rules of Civil Procedure for the United

13  States District Courts pertaining to the taking

14  of depositions, taken before Gina Callahan, a

15  notary public within and for the County of

16  Iroquois and State of Illinois, at 200 North

17  LaSalle Street, Suite 770, Chicago, Illinois, on

18  the 14th day of July, 2021, at the hour of

19  8:57 a.m.

20

21

22

23

24

**Plaintiff's Exhibit 3**

1  clinical outreach director?

2· · · ·A.· ·Yes.

3· · · ·Q.· ·And if you would refer, please, to your

4  report of March 9, 2020.

5· · · · · · Were you able to form an opinion as to

6  a range that reflects Holly Brooks' most likely

7  loss of earning capacity due to her disability?

8· · · ·A.· ·I was.

9· · · ·Q.· ·And what is your opinion, Mr. Gibson?

10· · · ·A.· ·That opinion is a rather broad range

11  based upon varying scenarios that I project in

12  the future.· The range goes from a low of

13  $372,776 to a high end of $2,508,659.

14· · · ·Q.· ·And are all those values reduced to

15  present value?

16· · · ·A.· ·They are.

17· · · ·Q.· ·And you indicated that is a broad

18  range.· Can you explain why that is the case?

19· · · ·A.· ·Sure.· To look at her earnings, I

20  explored it from two different scenarios on

21  where her earnings would go in the future in

22  terms of the how much question that we talked

23  about earlier.

24· · · · · · One was to look at how much Ms. Brooks



1  was earning given her completion of an MBA and
2  the work that she was doing for Lutheran at the
3  time -- well, not at the time, but at the time
4  of my interview after the injury.
5         By using that information, I noted that
6  her earnings was estimated at the time for her
7  salary of $78,520 per year, which looking into
8  the future and adjusting that for age-related
9  changes as she gets more experience, would
10 average over a lifetime approximately $90,523.
11        So that was one scenario that I used
12 for both her preinjury earning capacity, how
13 much she would have earned had this not
14 happened, and how much she is going to earn now
15 given her limitations.
16        Then I was also aware that she -- her
17 intent at the time of the injury was to finish
18 her bachelor's degree, which she did finish, and
19 to immediately pursue a career as a certified
20 registered nurse anesthetist, CRNA, which would
21 have involved some more training, more
22 education, take her out of the labor market for
23 a while but then bring her back.
24        Using that information and using data



1  from the U.S. Bureau of Labor Statistics on the
2  expected earnings for such a position, I
3  projected a lifetime average earnings for her
4  under that career path of $146,366.
5· · · · · ·However, that's only on the preinjury
6  side, with the injury not occurring.· Given her
7  limitations, she is not able to pursue that type
8  of work; therefore, I would use the same $90,000
9  I talked about on the postinjury side as a
10 comparable.
11· · · Q.· ·And why would you project, if she
12 continued to work using her master's of business
13 administration degree, that she would still have
14 a loss of earnings in the range -- in the lower
15 range of $372,776?
16· · · A.· ·As I touched on a little bit earlier,
17 lifetime earnings is driven by two questions:
18 How much and how long.· The how much is what we
19 identified by an average earnings of $90,000 per
20 year under that scenario.
21· · · · · ·However, the other question is how
22 long.· And what the data tells us from every
23 single survey that's ever been conducted on the
24 impact of disability on employment is that



1· ·expected probabilities of employment consistent

2· ·with males, and therefore, I use a male worklife

3· ·expectancy as an alternate scenario.

4· · · · Q.· Do I understand correctly that it is

5· ·your opinion that if Holly Brooks had not been

6· ·injured and would have been able to pursue her

7· ·career as a certified registered nurse

8· ·anesthetist, you believe the present value of

9· ·her lifetime earning capacity in that occupation

10· ·would be somewhat in excess of two and a half

11· ·million dollars; is that correct?

12· · · · A.· Yes.· And there again, there is the

13· ·range based upon male versus female worklife.

14· ·The female worklife would say about $2 million

15· ·rounding, and the male worklife would say two

16· ·and a half million.

17· · · · Q.· Once you learned in early 2021 that

18· ·Holly Brooks had left her clinical outreach job

19· ·at Lutheran Hospital and became re-employed as a

20· ·nurse administering COVID injections in Miami,

21· ·did you then conduct your second interview of

22· ·her?

23· · · · A.· I did.

24· · · · Q.· And did the information you received



1  indicate that it would be appropriate to
2  reassess your earlier calculations?
3·         MR. LORINGER:  Objection to form,
4  leading.  Go ahead.
5·         THE WITNESS:  Yes.
6  BY MR. CHESTER:
7·    Q.   And using the new earnings information
8  that Ms. Brooks provided to you, were you able
9  to do that?
10·   A.   I was.
11·   Q.   And did you use the same basic
12  methodology?
13·   A.   I did.  And pretty much the same basic
14  conclusions, just adjusting for more modern
15  statistics and adjusting the starting point of
16  my analysis.
17·   Q.   Okay.  And did you prepare three tables
18  reflecting your calculations?
19·   A.   Yes.
20·   Q.   Let me show you another board we have.
21  It is marked in three categories as Plaintiff's
22  Exhibit 1, Plaintiff's Exhibit 2 and Plaintiff's
23  Exhibit 3.
24·        First of all, Mr. Gibson, did you



1  expectancy would be 25.7 years from the date of

2  my report going forward, and actually is from

3  July 1st of 2021 going forward; and that the

4  using male statistics, that her worklife is more

5  than three years longer, at 29 years.

6· · · · · · Comparably using statistics for a

7  non-severe physical disability, those worklife

8  expectancies drop from 25.7 to 22.2, so a loss

9  of three and a half years, or from 29 to 23.1, a

10  loss of almost six years.· So that's what drives

11  the reduction in how long she would work.

12· · · · · · Now, there is very little difference

13  here for this.· I've only included this row for

14  comparison in my earlier report.

15· · · · · · Now because the start date is July 1st

16  of 2021, the start date, the worklife

17  expectancies for nurse anesthetists are almost

18  identical to what you see for the director of

19  clinical outreach.

20· · ·Q.· ·So is it correct to say that Table 2

21  reflects the how long she will be able to work?

22· · ·A.· ·Yes.

23· · ·Q.· ·And it reflects some reduction in what

24  you would expect for her worklife expectancy?


1          MR. LORINGER:  Objection to form.

2  Leading.

3  BY MR. CHESTER:

4      Q.   Let me rephrase it.

5           Does Table 2 reflect a reduction in

6  Holly Brooks' future worklife expectancy?

7      A.   It does.  That reduction, indicated by

8  comparing this number to that number, or 3.5

9  years, this number to that number.  And that's

10 based upon statistics again from the American

11 Community Survey that show that persons with a

12 non-severe physical disability have lower

13 probabilities of future of employment, and those

14 lower probabilities of future employment are

15 what are used to drive the statistically

16 expected number of years that a person will

17 work.

18     Q.   Why is it relevant to bring in worklife

19 expectancies for males?

20     A.   Again, that goes back to the fact that

21 female worklife expectancies are distorted due

22 to a large percentage of females that opt to

23 stay at home and raise a family, who are counted

24 as zero percent employed, while career-driven



| | |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | |
| 3 | I, GINA CALLAHAN, a Certified Shorthand |
| 4 | Reporter in the state of Illinois, do hereby |
| 5 | certify that heretofore, to-wit, on the 14th day |
| 6 | of July, 2021, personally appeared before me, at |
| 7 | 200 North LaSalle Street, Chicago, Illinois, |
| 8 | DAVID S. GIBSON, in a cause now pending and |
| 9 | undetermined in the United States District |
| 10 | Court, Southern District of Indiana, wherein |
| 11 | HOLLY L. BROOKS is the Plaintiff, and AIR |
| 12 | METHODS CORPORATION is the Defendant. |
| 13 | I further certify that the said witness was |
| 14 | first duly sworn to testify the truth, the whole |
| 15 | truth and nothing but the truth in the cause |
| 16 | aforesaid; that the testimony then given by said |
| 17 | witness was reported stenographically by me in |
| 18 | the presence of the said witness, and afterwards |
| 19 | reduced to typewriting by Computer-Aided |
| 20 | Transcription, and the foregoing is a true and |
| 21 | correct transcript of the testimony so given by |
| 22 | said witness as aforesaid. |
| 23 | I further certify that the signature to the |
| 24 | foregoing deposition was waived by counsel for |



1  the respective parties.
2      I further certify that the taking of this
3  deposition was pursuant to Notice, and that
4  there were present at the deposition the
5  attorneys hereinbefore mentioned.
6      I further certify that I am not counsel for
7  nor in any way related to the parties to this
8  suit, nor am I in any way interested in the
9  outcome thereof.
10      IN TESTIMONY WHEREOF:  I have hereunto set my
11  hand this 15th day of July, 2021.
12
13
14
15  _____
16      CERTIFIED SHORTHAND REPORTER
17
18
19
20
21
22
23
24

